UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Bloomington Lincoln Mercury Inc. *d/b/a*
*Lincoln of Bloomington*,

        Plaintiff and Counter
Defendant,

v.

Clear Blue Specialty Insurance Company,

        Defendant and Counter
Claimant.

File No. 25-cv-51 (ECT/SGE)

**OPINION AND ORDER**

---

Gregory J. Johnson, G Johnson Law PLLC, Apple Valley, MN, for Plaintiff and Counter Defendant Bloomington Lincoln Mercury Inc.

Kathleen K. Curtis, Nilan Johnson Lewis, Minneapolis, MN, for Defendant and Counter Claimant Clear Blue Specialty Insurance Company.

---

Plaintiff Bloomington Lincoln Mercury purchased sixty pre-owned vehicles from sellers in Canada and arranged for their importation. Soon after the vehicles were trucked into the United States, they were unloaded and parked in Burton, Michigan, where they underwent work and inspection essential to their lawful importation and retitling. While parked in Burton, the vehicles sustained hail damage.

Bloomington Lincoln submitted a claim to its insurer, Defendant Clear Blue Specialty Insurance Company. Clear Blue denied the claim, prompting Bloomington Lincoln to bring this breach-of-contract case. The coverage issue is whether the vehicles were "in transit" when the hail damage occurred.

Clear Blue seeks judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The motion will be granted because (1) I predict the Minnesota Supreme Court would adopt the interpretation of "in transit" described in many persuasive cases, and (2) under that rule, the cars were not "in transit" when they sustained hail damage because they were undergoing substantial work separate from and unrelated to their transit.

*Subject-Matter Jurisdiction*

Bloomington Lincoln brought this case originally in Hennepin County, Minnesota District Court. Compl. [ECF No. 1-1]. Clear Blue removed the case to this court, alleging there is federal subject-matter jurisdiction under the general diversity statute, 28 U.S.C. § 1332(a)(1). Notice of Removal [ECF No. 1] ¶¶ 7–8. "To remove a case from a state court to a federal court, a defendant must file in the federal forum a notice of removal 'containing a short and plain statement of the grounds for removal.'" *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 83 (2014) (quoting 28 U.S.C. § 1446(a)). In *Dart*, the Supreme Court interpreted § 1446(a)'s "short-and-plain-statement" requirement to mean that a removing defendant must include factual allegations in its notice of removal plausibly showing that statutory jurisdictional prerequisites are met. *Id.* at 87–89. Here, in other words, *Dart* required Clear Blue to allege facts plausibly showing that it and Bloomington Lincoln were citizens of different states and that the amount in controversy exceeded "$75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a)(1).

Clear Blue alleged that Bloomington Lincoln is a Minnesota citizen because it is incorporated under Minnesota law and maintains its principal place of business here. Notice of Removal ¶ 11; *see* 28 U.S.C. § 1332(c)(1); *see also* Compl. ¶ 4 (alleging that

2

Bloomington Lincoln "has its principle [sic] place of business in Hennepin County"). Clear Blue alleged that it maintains its principal place of business in Puerto Rico and that it was "domiciled in North Carolina until January 6, 2023," when it became "domiciled in Texas." Notice of Removal ¶ 12. It seems safe to presume Clear Blue intended "domiciled" to describe its state of incorporation. *See id.* Articles of Redomestication that Clear Blue filed in North Carolina make this clear. The Articles explain that, on their effective date, Clear Blue became "organized" under Texas law. Clear Blue Specialty Insurance Company, N.C. Sec'y of State, https://www.sosnc.gov/online_services/search/profile_filings/4785843 (last visited June 1, 2026) (click on "View Filing (PDF)" under "Destruction Filing"). In addition to the parties' diverse citizenship, the amount in controversy comfortably exceeds the $75,000 threshold. In its Complaint, Bloomington Lincoln seeks a judgment "in excess of $400,000" exclusive of interest and costs. Compl. ¶ 28; Notice of Removal ¶ 17.

*The Familiar Rule 12(c) Standards*

"Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Lansing v. Wells Fargo Bank, N.A.*, 894 F.3d 967, 971 (8th Cir. 2018) (citation modified); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Cargill, Inc.*, 61 F.4th 615, 619 (8th Cir. 2023) (citation modified). A Rule 12(c) motion for judgment on the pleadings is assessed under the same standard as a Rule 12(b)(6) motion. *Ashley County v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable

3

inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As with Rule 12(b)(6) motions, "courts are not strictly limited to the four corners of complaints," when deciding Rule 12(c) motions but may consider other matters, including "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned[] without converting the motion into one for summary judgment." *Dittmer Props., L.P. v. FDIC*, 708 F.3d 1011, 1021 (8th Cir. 2013) (citation modified); *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526–27 (8th Cir. 2017) (explaining that consideration of matters outside the pleadings or evidence in opposition to the pleadings generally converts a Rule 12(b)(6) motion into one for summary judgment). When a contract is the basis of the dispute, that contract is "necessarily embraced" by the pleadings and may be considered. *Zean*, 858 F.3d at 526–27.

*Regulatory Context*

A high-level review of relevant motor-vehicle-import regulations helps to place the background facts in context. A motor vehicle may be imported into the United States

4

provided, among other statutory requirements, it is "capable of being readily altered to comply with applicable motor vehicle safety standards," and is "imported by a registered importer." 49 U.S.C. § 30141(a)(1)(A)(iv), (a)(2). For each vehicle to be imported, a registered importer must provide "at the time of importation a bond in an amount equal to 150 percent of the dutiable value of the vehicle," 49 C.F.R. § 592.6(a), and file a declaration with U.S. Customs and Border Protection, *id.* § 591.5. Relevant here, an importer may state in the required declaration that, although a vehicle to be imported "does not conform with all applicable Federal motor vehicle safety and bumper standards (but does conform with all applicable Federal theft prevention standards), . . . the importer is eligible to import it because" (1) "[t]he importer has furnished a bond in an amount equal to 150% of the dutiable value of the vehicle," (2) the importer has registered with the National Highway Traffic Safety Administration ("NHTSA") and the NHTSA "has determined" that "the model and model year of the vehicle to be imported is eligible for importation into the United States," and (3) "[t]he vehicle is not a salvage motor vehicle or a reconstructed motor vehicle." *Id.* § 591.5(f).

A registered importer is required to "[t]ake possession of the vehicle and perform all modifications necessary to conform the vehicle to all Federal motor vehicle safety and bumper standards that apply to the vehicle at a facility that it has identified to the [NHTSA]." *Id.* § 592.6(c). "Within 120 days of the importation," a registered importer must certify to the NHTSA that "it has brought the motor vehicle into conformity with all applicable Federal motor vehicle safety and bumper standards." *Id.* § 592.6(d)(1). A registered importer may not "obtain title, licensing, or registration of the motor vehicle for

use on the public roads, or release custody of it for such titling, licensing, or registration" until the NHTSA accepts the registered importer's certification. *See id.* § 592.8. The NHTSA's acceptance of the certification may or may not require an inspection. *See id.* § 592.8(c). The parties agree this process often "involve[s] processing the U.S. title paperwork, odometer and speedometer modifications, [and] resolving any open manufacturer recalls on the vehicles." Countercl. [ECF No. 4 at 8–17] ¶ 21;[1] *see* Reply [ECF No. 6] ¶ 12.

### Background Facts

The material facts are all in the record, and they are undisputed. Bloomington Lincoln "purchased 60 pre-owned vehicles from Canadian auctions and Canadian auto dealerships for import into the [United States] and ultimate delivery to [Bloomington Lincoln] at its business premises" in Bloomington, Minnesota. Compl. ¶¶ 2, 5. Bloomington Lincoln hired AJ Importing, "a Michigan company certified and approved by [the NHTSA] to operate as a 'Registered Importer' of pre-owned vehicles from Canada." *Id.* ¶ 6. Baker Auto of Burton, a trucking company and affiliate of AJ Importing, transported the vehicles from Canada to Burton, Michigan, for which Bloomington Lincoln paid Baker Auto a flat fee per vehicle. Countercl. ¶ 19; Reply ¶ 11. Bloomington Lincoln paid a separate fee to AJ Importing "for the import and titling process." Countercl. ¶ 20; Reply ¶ 11; *accord* Compl. ¶ 6 ("AJ Importing transported the 60 pre-owned vehicles from the locations of the vehicle sellers in Canada to the U.S. border in Michigan, filed the

---

[1] Page citations are to pagination assigned by the Court's CM/ECF system, not to a document's original pagination.

federally required declaration and bond and transported the vehicles to Burton, Michigan to complete the federally mandated certification and titling process on the vehicles.").

Under the applicable regulations described above, AJ Importing was forbidden from releasing the vehicles to Bloomington Lincoln until after it certified the vehicles had been brought into compliance with federal safety standards, and the NHTSA approved the vehicles' release. After these events occurred, Bloomington Lincoln would "retain[] a trucking company to transport the released vehicles from Michigan" to Bloomington Lincoln's Minnesota lot. Countercl. ¶ 22; Reply ¶ 15. On July 20, 2023—while the sixty at-issue vehicles were parked in Burton, Michigan, "undergoing the federally mandated certification and titling processes and/or awaiting the receipt of bond release letters from the NHTSA"—the vehicles were damaged in a hailstorm. Compl. ¶ 7.

In the ordinary course of its business, Bloomington Lincoln "receives a truckload approximately once a week with eight or nine cars that have gone through this process with AJ Importing LLC." Countercl. ¶ 22; Reply ¶ 15. Bloomington Lincoln "pays different trucking companies, based on their availability, to haul vehicles from Michigan to Minnesota." Countercl. ¶ 22; Reply ¶ 15. On average, Bloomington Lincoln has approximately fifty vehicles at AJ Importing at any given time "because [Bloomington Lincoln] is continuously importing vehicles through this process." Countercl. ¶ 23; Reply ¶ 15. It takes on average about twenty-five days for Bloomington Lincoln–purchased vehicles imported from Canada to be delivered to Bloomington Lincoln's Minnesota lot. Countercl. ¶ 21, Reply ¶ 13.

*Relevant Policy Provisions*

The policy required Clear Blue to "pay for **loss** . . . unless otherwise limited or excluded, to a **covered auto** from any cause except **loss** due to **collision**." ECF No. 4-1 at 14. The policy defined "loss" as "direct and accidental loss of or damage to **covered autos** resulting from a single cause or event." *Id.* at 13. The policy provided that Clear Blue "[would] only pay for **loss** or damage to **covered autos** occurring during the **coverage period** shown on the Declarations or Evidence of Coverage and within the **coverage territory**." *Id.* at 19. The "coverage territory" was "the United States of America, its territories, and possessions." *Id.* at 12. The policy defined an "auto" as "a land motor vehicle, trailer, or semitrailer, including any permanently attached equipment, or any watercraft taken in trade while such watercraft is on land." *Id.* at 11.

A "covered auto" was "[a]n **auto** which is parked at a **location** when not in use or which is in transit to or from a **location**, except if in transit from the **manufacturer**, and . . . which you own. *Id.* at 12. "Location" meant "a physical property at which **covered autos** are held for **sale**, stored, or used in your business, and . . . which is shown on the Declarations or Evidence of Coverage." *Id.* at 13. The Burton, Michigan location was not "shown on the Declarations or Evidence of Coverage." *See* Def.'s Mem. in Supp. [ECF No. 20] at 7, 10 (noting the Burton location was "an unlisted location" and "[t]here is . . . no dispute that [the vehicles] were not at a **location**, as that term is defined under the Policy, at the time of the hailstorm"). Clear Blue denied Bloomington Lincoln's claim on the ground that the hail-damaged vehicles were not "in transit" when they were damaged. *See* Compl. ¶ 16; Countercl. ¶ 26.

8

*Minnesota Rules Governing Insurance Policy Interpretation Generally*[2]

In applying Minnesota law, a federal district court sitting in diversity "must predict how the Supreme Court of Minnesota would rule, and . . . follow decisions of the [Minnesota Court of Appeals] when they are the best evidence of Minnesota Law." *Neth. Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) (quoting *Friedberg v. Chubb & Son, Inc.*, 691 F.3d 948, 951 (8th Cir. 2012)). Under Minnesota law, "[i]nterpretation of an insurance policy and application of the policy to the facts in a case are questions of law." *Am. Fam. Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn. 2001). "When examining an insurance policy, a court's function is to 'determine what the agreement was and enforce it.'" *Murray v. Greenwich Ins. Co.*, 533 F.3d 644, 648 (8th Cir. 2008) (quoting *Fillmore v. Iowa Nat'l Mut. Ins. Co.*, 344 N.W.2d 875, 877 (Minn. Ct. App. 1984)). Words are given their "natural and ordinary meaning" and ambiguities regarding coverage are "construed in favor of the insured." *Walser*, 628 N.W.2d at 609. But a court may not create ambiguities where none exist. *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 706 (Minn. 2013). "Minnesota courts often look to dictionary definitions to ascertain the plain meaning of an undefined term." *Pour v. Liberty Mut. Pers. Ins. Co.*, 160 F.4th 899, 907 (8th Cir. 2025) (collecting cases).

---

[2]   The Parties agree Minnesota law governs. *See* Def.'s Mem. in Supp. at 8–10; Pl.'s Mem. in Opp'n [ECF No. 28] at 6–8. Because the policy was issued to a Minnesota-based business, there is no reason to second-guess the parties' agreement on this point, and Minnesota law will be applied. *See Neth. Ins. Co.*, 745 F.3d at 913 ("Because the parties do not dispute the choice of Minnesota law, we assume, without deciding, Minnesota law applies . . . ."); *see also Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010).

*Cases Interpreting "In Transit."*

The Minnesota Supreme Court has not interpreted an insurance policy's "in transit" provision. Many other courts have. Several rules emerge from these cases. "In transit" means "on the way or passage; while passing from one person or place to another; in the course of transportation." *Williams v. Berube & Assocs.*, 26 S.W.3d 640, 644 n.2 (Tenn. Ct. App. 2000) (quoting *In transitu*, *Black's Law Dictionary* (5th ed. 1979)); *see Utica Mut. Ins. Co. v. Precedent Cos.*, 782 N.E.2d 470, 476 (Ind. Ct. App. 2003) ("[T]he "plain meaning" of the word 'transit' is the '[c]onveyance of . . . goods from one place to another . . . ." (quoting *Transit*, *The American Heritage Dictionary of the English Language* 1901, without identifying edition)).[3]

Goods are not "in transit" until they leave the seller or sender's control. *Pac. Tall Ships Co. v. Kuehne & Nagel Inc.*, 76 F. Supp. 2d 886, 892 (N.D. Ill. 1999). In other words, "[c]argo cannot simultaneously be 'in preparation for transit' and 'in transit.'" *Id.* (citing *Kessler Exp. Corp. v. Reliance Ins. Co.*, 207 F. Supp. 355, 358 (E.D.N.Y. 1962)). And cargo cannot be "in transit" after it reaches its intended destination. *KMC Mgmt. Corp. v. Certain Underwriters at Lloyd's Lond.*, No. C7-00-1148, 2000 WL 1742096, at *2 (Minn. Ct. App. Nov. 28, 2000) (holding that funds wired from a bank to a mortgage-loan originating company were not "'in transit' because they had reached the destination to which [the bank] transmitted them"); *Fireman's Fund Ins. Co. v. Serv. Transp. Co.*, 466 F. Supp. 934, 935–37 (D. Md. 1979) (holding that coffee shipment was not "in transit"

---

[3]    Bloomington Lincoln agreed that "in transit" should be given these same meanings. Pl.'s Mem. in Opp'n at 6. It did not argue the phrase is ambiguous. *See id.*

because the cargo reached the parties' agreed-on destination); *Boonton Handbag Co. v. Home Ins. Co.*, 310 A.2d 510, 511–12 (N.J. Super. Ct. App. Div. 1973) (holding that handbags were not "in transit" because they "had arrived at their destination and were merely being stored prior to unloading"); *Whitehall Co. v. N.H. Ins. Co.*, 281 N.E.2d 234, 234–35 (Mass. 1972) (holding that whiskey shipment was not "in transit" because it "had come to rest in Boston, its ultimate destination").

Many cases address whether goods remain "in transit" when there is an interruption in the items' movement. In these situations, courts seem to agree that goods remain "in transit" during stops that are "incidental to the main purpose of delivery" or "related to the transportation itself." *Aetna Cas. & Sur. Co. v. Burbank Generators, Inc.*, 175 Cal. Rptr. 568, 570 (Cal. Ct. App. 1981); *e.g.*, *CashZone Check Cashing Corp. v. Vigilant Ins. Co.*, 981 N.Y.S.2d 698, 702 (N.Y. App. Div. 2014) (describing "the test for whether something is in transit [as] whether the goods, even though temporarily at rest, were still on their way, with the stoppage being merely incidental to the main purpose of delivery" (citation modified)); *Palm Desert Nat'l Bank v. Fed. Ins. Co.*, 473 F. Supp. 2d 1044, 1049 (C.D. Cal. 2007) (recognizing that items remain "in transit" during a "stoppage . . . merely incidental to the main purpose of delivery" (citation modified)); *Hartford Cas. Ins. Co. v. Banker's Note, Inc.*, 817 F. Supp. 1567, 1573 (N.D. Ga. 1993) ("Courts in other states have held that '[p]roperty is considered in transit when it is moving from one location to another. This does not exclude temporary stops, incidental delays, or some deviation from the planned route of travel.'" (quoting *Boonton Handbag Co.*, 310 A.2d at 511)); *U.S. Fire Ins. Co. v. Altech Yachts Inc.*, No. 90 Civ. 8143 (LMM), 1991 WL 238246, at *5 (S.D.N.Y.

Nov. 1, 1991) ("A temporary interruption for purposes related to the carriage itself does not take the [shipment] out of the due course of transit."); *Ben Pulitzer Creations, Inc. v. Phoenix Ins. Co.*, 263 N.Y.S.2d 373, 376 (N.Y. Civ. Ct. 1965) ("The true test thus appears to be not whether movement was interrupted overnight, or over a week end, but whether the goods, even though temporarily at rest, were still on their way, with any stoppage merely incidental to the main purpose of delivery."); *Dealers Dairy Prods. Co. v. Royal Ins. Co.*, 164 N.E.2d 745, 747 (Ohio 1960) (recognizing that "in transit" includes "stops along the way incidental to the carriage" and for "purposes connected with the carriage"); *Koshland v. Columbia Ins. Co.*, 130 N.E. 41, 43 (Mass. 1921) ("The delays commonly incident to a movement of merchandise across the continent would not ordinarily be thought to suspend transportation or transit.").

On the flip side, courts seem to agree that items do not remain "in transit" during stops that occur for a collateral, non-transit-related purpose, though what counts as collateral is the subject of some disagreement. *See Hartford Cas. Ins. Co.*, 817 F. Supp. at 1574 (holding that theft of merchandise from trailer did not occur "in transit" because the trailer had been parked to facilitate the carrier's "unrelated business needs"); *Dealers Dairy Prods. Co.*, 164 N.E.2d at 747 (holding that equipment was not stolen "in transit" where, at the insured's request, the equipment had been unloaded from a truck to enable the carrier to use the truck to transport different items for the insured); *Koshland*, 130 N.E. at 43–44 (holding that damage to wool did not occur "in transit" because the stoppage's purpose was "to prepare the wool for market" through "scouring, blending and baling"). In *Palm Desert National Bank*, for example, funds belonging to a bank that provided cash to fill automated

teller machines (or "ATMs") were stolen by an armored-car company the bank hired to transport the cash to, and to stock, the ATMs. 473 F. Supp. 2d at 1045. The thefts occurred at the armored-car company's office. *Id.* While transporting the cash from the bank to the ATMs, the armored-car company stopped at its office, unloaded cash, and placed the cash in ATM cassettes necessary to install the cash in ATMs. *Id.* The court held that the thefts did not occur "in transit" because the stop was necessary to perform work on the cargo that was essential—not to the cash's transportation—but to the cash's preparation necessary for loading it into ATMs. *See id.* at 1048–51. *CashZone Check Cashing Corp.* and *Palm Desert National Bank* involved very similar facts, but the courts came to different results. *See* 981 N.Y.S.2d at 699–700. The New York court in *CashZone Check Cashing Corp.* appears to have applied the same rule the court applied in *Palm Desert*—that is, items do not remain "in transit" if a stop is not "merely incidental to the main purpose of delivery." *CashZone Check Cashing Corp.*, 981 N.Y.S.2d at 702. Regardless, the court reached the opposite holding, reasoning that, "[b]ecause the contemplated delivery process necessarily included the sorting and processing of the money, we consider the entire process to be included in the 'transit' of the cash." *Id.* at 703.

The distinction between interruptions that are "incidental" to transportation and stoppages that are collateral or unrelated to transportation is informed by the nature of the insurer's accepted risks. "Risks of transportation . . . include those which occur during the course of carriage of goods from one place to another, including such transfers, transshipments, and other delays as fairly may be incident to such carriage." *Williams v. Mannheim Ins. Co.*, 130 N.E. 45, 46 (Mass. 1921). In other words, if a stoppage placed

13

risks on an insurer beyond these ordinary transit-related risks, it seems only logical to consider whether that shows the stoppage was not incidental to transportation.

*Applying These Authorities to Bloomington Lincoln's Claim*

Predicting the Minnesota Supreme Court would adopt the interpretation of an "in transit" clause in line with these cases seems safe. The rule that stoppages incident to transit fall within an "in transit" coverage clause—and its counterpart rule that interruptions collateral or unrelated to transit do not—are widely accepted. When courts reach different results on comparable facts, it's not because the courts applied different rules. It's because they differed in how the same rule applied to the cases' facts. Importantly, the parties do not identify a different rule the Minnesota Supreme Court might adopt.

Applying the rule here, the at-issue vehicles were not "in transit" when they sustained hail damage in Michigan as a matter of law because the purposes for the vehicles' stoppage there were not "incidental" or connected to the vehicles' transportation in the relevant sense. This is so for several reasons. The stoppage was not for transportation-specific activities. It was necessary to perform work on the vehicles to bring them into compliance with applicable federal standards and, when that work was completed, to affirm the vehicles met those standards. 49 C.F.R. § 592.6(d)(1). Without that, none of the vehicles could be titled, licensed, registered, driven for use on public roads, or sold by Bloomington Lincoln in the United States. In other words, the work was necessary to modify and repurpose the vehicles so they might be lawfully sold and driven here. That sort of work isn't ordinarily part of or incident to "transit." In this sense, the vehicles in this case are very much like the wool in *Koshland*. There, the court explained, the transit

14

stoppage occurred so that work could be performed on the wool to prepare it for market, and, the court reasoned, preparing a product for market is not incident to the product's transportation. *Koshland*, 130 N.E. at 43.

The arrangements surrounding the vehicles' importation confirm this conclusion. Bloomington Lincoln hired an AJ Importing affiliate, Baker Auto of Burton, to truck the vehicles from Canada into Michigan for a flat, per-vehicle fee. Countercl. ¶ 19; Reply ¶ 11. Bloomington Lincoln paid AJ Importing separately "for the import and titling process." Countercl. ¶ 20; Reply ¶ 11. And Bloomington Lincoln made separate additional arrangements for the vehicles to be trucked from Michigan to Minnesota. Countercl. ¶ 22; Reply ¶ 15. In other words, the transit arrangements were separate from—that is, they separately preceded and followed—the federal-compliance arrangements. For that reason, this case is materially different from *CashZone Check Cashing Corp.* There, by contrast, the court determined that "the contemplated delivery process necessarily included the sorting and processing of the money," meaning the work done on the money was "included in the 'transit' of the cash." 981 N.Y.S.2d at 703. We don't have that here. This was not an all-in-one transportation-and-federal-compliance arrangement.

Finally, it seems worth observing that the risks associated with parking vehicles in an uncovered lot for several days or weeks exceed the transportation-specific risks Clear Blue accepted when it issued the policy to Bloomington Lincoln. *See Williams*, 130 N.E. at 46–47 (recognizing that storage of wool "for the purpose of undergoing treatment in order to fit it to be merchantable" poses risks beyond those ordinarily incident to transportation).

Bloomington Lincoln argues that *Altech Yachts* supports its position, but I do not agree. That case involved the transportation of a yacht from Taiwan to New Jersey, and then by road from New Jersey to Westfield, New York, where it was to be "placed in the waters of Lake Erie so that the purchasers could move it, under its own power, to its final destination" in Michigan. *Altech Yachts Inc.*, 1991 WL 238246, at *1. "Because of the yacht's large size, the transporter was required to obtain permits and land surveys" before transiting the yacht from New Jersey to Westfield. *Id.* After the yacht's arrival in Newark on November 13, 1990, the transporter began working to obtain the required transportation permits and surveys. *Id.* Departure was scheduled for November 26. *Id.* "During the night of November 24, however, a fire broke out aboard the yacht causing substantial physical damage." *Id.* There, as here, the coverage issue was whether the fire damage occurred while the yacht was "in transit." *Id.* at *4. Applying the incident-to-transit rule, the court concluded the stoppage in Newark amounted to "[a] temporary interruption for purposes related to the carriage itself" that did "not take the yacht out of the due course of transit." *Id.* at *5. As the court observed, the travel permits and surveys weren't just incident to the yacht's transportation; they were necessary. *Id.* In that sense, the connection between the delay and transit was direct and essential. That kind of connection is absent in this case. Here, the Michigan stoppage was necessary to perform federally-mandated work and inspections essential to make the vehicles merchantable in the United States. It is true that the inability to transport the vehicles to Bloomington Lincoln in Minnesota followed from the need to first comply with these requirements, but the regulations are not transportation-related like those described in *Altech Yachts*, and the inability to transport

16

the cars was an indirect consequence of the regulations. Put another way, I think the outcome in *Altech Yachts* would have been different if the inability to transport the yacht resulted from the dealer's failure to bring the yacht into compliance with federal regulations governing the yacht's safety or navigational systems, as opposed to the need to meet transportation-specific requirements.

*Dismissal With or Without Prejudice*

Courts have discretion to decide between a with-prejudice and without-prejudice dismissal. *See Paisley Park Enters., Inc. v. Boxill*, 361 F. Supp. 3d 869, 880 n.7 (D. Minn. 2019). A dismissal with prejudice is typically appropriate when a plaintiff has shown "persistent pleading failures" despite one or more opportunities to amend, *Milliman v. County of Stearns*, No. 13-cv-136 (DWF/LIB), 2013 WL 5426049, at *16 (D. Minn. Sep. 26, 2013); *see Reinholdson v. Minnesota*, No. 01-cv-1650 (RHK/JMM), 2002 WL 32658480, at *5 (D. Minn. Nov. 21, 2002) (adopting R. & R.), or when the record makes clear that any amendment would be futile, *see Paisley Park*, 361 F. Supp. 3d at 880 n.7. On the other hand, when a plaintiff's claims "might conceivably be repleaded with success," dismissal without prejudice may be justified. *Washington v. Craane*, No. 18-cv-1464 (DWF/TNL), 2019 WL 2147062, at *5 (D. Minn. Apr. 18, 2019), *R. & R. adopted*, 2019 WL 2142499 (D. Minn. May 16, 2019). Here, a with-prejudice dismissal makes better sense. Bloomington Lincoln did not suggest it might be able to amend its Complaint to address the "in transit" issue, and it is difficult to see how it could. It did not identify extra-record facts it might need to support its claims or arguments. The record facts are complete and undisputed. And the decision came down to a question of law.

17

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Defendant and Counter Claimant Clear Blue Specialty Insurance Company's Motion for Judgment on the Pleadings [ECF No. 18] is **GRANTED**.

2.      Plaintiff Bloomington Lincoln Mercury Inc.'s Complaint [ECF No. 1-1] is **DISMISSED WITH PREJUDICE**.

3.      Judgment shall be entered in Defendant and Counter Claimant Clear Blue Specialty Insurance Company's favor on its Counterclaim to the extent the Counterclaim seeks a declaration that it has no obligation to cover Bloomington Lincoln Mercury Inc.'s loss or to indemnify it for the damages asserted in this action.

### LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: June 1, 2026                             s/ Eric C. Tostrud
                                                Eric C. Tostrud
                                                United States District Court

18